Brent H. Blakely (SBN 157292)
bblakely@blakelylawgroup.com
Cindy Chan (SBN 247495)
cchan@blakelylawgroup.com
BLAKELY LAW GROUP
1334 Parkview Avenue, Suite 280
Manhattan Beach, California 90266
Telephone: (310) 546-7400
Facsimile: (310) 546-7401

*Attorneys for Plaintiff*
*Poquito Mas Licensing Corporation*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| POQUITO MAS LICENSING CORPORATION, a California Corporation, <br><br> Plaintiff, <br><br> vs. <br><br> TACO BELL CORP., a California Corporation; and DOES 1-10, inclusive; <br><br> Defendant. | CASE NO. 8:13-CV-01933 DOC (JPRx) <br><br> **PLAINTIFF POQUITO MÁS LICENSING CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT TACO BELL CORP.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION** |
| TACO BELL CORP., a California Corporation; FOOTE CONE & BELDING ADVERTISING INC., <br><br> Counter-Plaintiffs, <br><br> vs. <br><br> POQUITO MÁS LICENSING CORPORATION, a California Corporation, and KEVIN MCCARNEY, an individual <br><br> Counter-Defendants | HEARING: <br><br> Date:          January 12, 2015 <br> Time:          8:30 a.m. <br> Courtroom:  9D <br><br> **Hon. David O. Carter** <br><br> Motion Hearing Cut-Off: 01/12/2015 <br> Pre-Trial Conference:     03/02/2015 <br> Trial Date:                    03/10/2015 |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    FACTS.......................................................................................................2

       A.     Poquito Mas and its MÁS Marks .................................................2

       B.     Defendant Taco Bell .....................................................................3

       C.     Taco Bell Rebrands .......................................................................4

       D.     Taco Bell Attempts to License Rights to MÁS From Poquito
              Mas .................................................................................................4

       E.     Taco Bell Launches MÁS ..............................................................5

III.   LEGAL ARGUMENT ............................................................................7

       A.     Triable Issues Of Fact Exist Regarding Liability .........................8

              1.     Plaintiff has Standing to Assert Claims on All of its MÁS
                     Marks ..................................................................................8

              2.     No Basis For Summary Judgment on Likelihood of
                     Confusion............................................................................9

                     a.     Strength of Parties' Respective MÁS Marks .............11

                     b.     Parties Respective Goods/Services are Identical........13

                     c.     The Parties' Marks are Highly Similar ......................14

                     d.     Evidence of Actual Confusion...................................15

                     e.     Parties Use Identical Marketing Channels .................16

                     f.     There is a Low Degree of Consumer Care.................17

                     g.     Taco Bell Acted With Knowledge of Plaintiff's
                            MÁS marks .................................................................17

                     h.     Defendants' Use of MÁS Hinders Plaintiff's
                            Expansion ...................................................................18

       B.     Triable Issues Of Fact Exist Regarding Damages .........................18

**PLAINTIFF'S OPPOSITION TO DEFENDANT TACO BELL CORP.'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION**

1          1.    Plaintiff  Is Entitled to Damages in the Form of
2                Reasonable Royalties .........................................................20

3          2.    Plaintiff Is Entitled to Damages for Corrective
                 Advertising and Loss of Ability to Control Its Goodwill
4                and Reputation ..................................................................21

5          3.    Plaintiff Is Entitled to a Disgorgement of  Defendants'
6                Profits ...............................................................................23

7          4.    Plaintiff Is Entitled to Injunctive Relief..............................24

8          5.    Plaintiff Is Entitled to Punitive Damages and Attorney's
9                Fees....................................................................................25

10   IV.    CONCLUSION.......................................................................25

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT TACO BELL CORP.'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

# TABLE OF AUTHORITIES

## CASES

7–Eleven, Inc. v. Wechsler,
  2007 WL 1431084 (T.T.A.B.2007) ................................................................. 14

Adickes v. S.H. Kress & Co.,
  398 U.S. 144 (1970) ........................................................................................ 7

Adray v. Adry-Mart, Inc.,
  76 F.3d 984 (9th Cir., 1995) ........................................................................ 21

AM General v. DaimlerChrysler,
  311 F.3d 796 (7th Cir.2002) ........................................................................ 14

Americana Trading Inc. v. Russ Berrie & Co.,
  966 F.2d 1284 (9th Cir.1992) ...................................................................... 15

AMF, Inc. v. Sleekcraft Boats,
  599 F.2d 341 (9th Cir. 1979) ................................................................. 9, 13

Anderson v. Liberty Lobby,
  477 U.S. 242 (1986) ........................................................................................ 7

Audi AG v. D'Amato,
  469 F.3d 534 (6th Cir. 2006) ...................................................................... 17

Banjo Buddies, Inc. v. Renosky,
  399 F.3d 168 (3d Cir.2005) ......................................................................... 23

Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,
  376 F.3d 8 (1st Cir. 2004) ........................................................................... 19

Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,
  561 F.2d 1365 (10th Cir. 1977) .................................................................. 22

Boldface Licensing + Branding v. By Lee Tillett Inc.,
  940 F. Supp. 2d 1178 (CD Cal. 2013) ....................................................... 12

Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp.,
  174 F. 3d 1036 (9th Cir. 1999) ...................................................... 16, 17, 18

CaesarsWorld, Inc. v. Milanian,
  247 FS 2d 1171 (D.Nev., 2003) ................................................................. 14

Cairns v. Franklin Mint Co.,
  24 FS 2d 1013 (C.D. Cal. 1998) ........................................................... 15, 16

Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.,
  921 F.2d 467 (3d Cir. 1990) ........................................................................ 16

Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City,
  383 F.3d 110 (3d Cir. 2004) ........................................................................ 23

Days Inns Worldwide, Inc. v. Patel,
  2005 WL 4655381 (SD Cal. 2005) ............................................................. 22

Downing v. Abercrombie & Fitch,
    265 F.3d 994 (9th Cir.2001) ........................................................... 7

E&J Gallo v. Gallo Cattle,
    967 F. 2d 1280 (9th Cir. 1992) ..................................................... 15

E&J Gallo Winery v. Pasatiempos Gallo,
    905 F.Supp. 1403 (ED Cal. 1994) ................................................ 16

Entrepreneur Media, Inc. v. Smith,
    279 F.3d 1135 (9th Cir.2002) .......................................... 9, 11, 18

Fortune Dynamic, Inc. v. Victoria's Secret,
    618 F. 3d 1025 (9th Cir. 2010) ..................................................... 12

GoTo.com, Inc. v. Walt Disney Co.,
    202 F.3d 1199 (9th Cir., 2000) ..................................................... 14

Guru Denim v. L.A. Idol Fashion, Inc.,
    2012 U.S. Dist. LEXIS 10363 (C.D. Cal., Jan. 25, 2012) .............. 18

Harper House, Inc. v. ThoMÁS Nelson, Inc.,
    889 F. 2d 197 (9th Cir. 1989) ...................................................... 19

Healthport Corp. v. Tanita Corp. of Am.,
    563 FS 2d 1169 (D. Or. 2008) ..................................................... 19

Int'l Order of Job's Daughters v. Lindeburg & Co.,
    633 F.2d 912 (9th Cir. 1980) ......................................................... 9

Jerry's Famous Deli, Inc. v. Papanicolaou,
    383 F.3d 998 (9th Cir., 2004) ...................................................... 23

Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,
    150 F.3d 1042 (9th Cir. 1998) ..................................................... 11

KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,
    408 F.3d 596 (9th Cir.2005) ........................................................ 11

Lahoti v. VeriCheck, Inc.,
    586 F.3d 1190 (9th Cir.2009) ...................................................... 11

Lindy Pen Co. v. Bic Pen Corp.,
    982 F. 2d 1400 (9th Cir. 1993) ........................................ 18, 22, 23

Louis Vuitton Vuitton  v. Akanoc Solutions, Inc.,
    2010 WL 5598337 (ND Cal. 2010) .............................................. 25

Maier Brewing Co. v. Fleischman Distilling Corp.,
    390 F. 2d 117 (9th Cir. 1968) ..................................................... 18

Marlyn Nutraceuticals v. Mucos Pharma,
    571 F.3d 873 (9th Cir. 2009) ...................................................... 24

MGM v. Grokster, Ltd.,
    518 F.Supp.2d 1197 (CD Cal. 2007) ............................................................. 25

Network Automation v. Advanced Systems Concepts,
    638 F.3d 1137 (9th Cir. 2011) ............................................................. passim

Playboy Enterprises, Inc. v. Chen,
    1996 U.S. Dist. LEXIS 21916 (C.D. Cal. Oct. 1, 1997)............................... 18

Playboy Enters., Inc., v. Baccarat Clothing Co.,
    692 F.2d 1272 (9th Cir. 1982) .................................................................. 19

Polo Fashions v. Dick Bruhn,
    793 F.2d 1132 (9th Cir. 1986) .................................................................. 19

Pom Wonderful v. Purely Juice,
    2008 WL 4222045 (CD Cal. 2008) ........................................................... 24

Quia Corp. v. Mattel, Inc., Inc.,
    2011 WL 2749576 (N.D. Cal. July 14, 2011) ........................................... 19

R&R Partners v. Tover,
    2007 WL 1202802 (Nev. 2007) ................................................................ 24

Rearden v. Rearden,
    683 F.3d 1190 (9th Cir. 2012) .................................................................... 9

Sands, Taylor & Wood v. Quaker Oats Co.,
    34 F.3d 1340 (7th Cir. 1994) .................................................................... 19

Scarves by Vera v. Todo Imports, Ltd.,
    544 F.2d 1167 (2d Cir.1976) ..................................................................... 12

Skydive Ariz. v. Quattrochi,
    704 FS 2d 841 (D.Ariz.,2010) ................................................................... 22

Southland Sod Farms v. Stover Seed,
    108 F. 3d 1134 (9th Cir. 1997)..................................................................... 7

Surfvivor Media v. Survivor Productions,
    406 F.3d 625 (9th Cir.2005) ....................................................................... 9

Two Pesos Inc. v. Taco Cabana, Inc.,
    505 U.S. 763 (1992) ................................................................................. 11

United States v. Diebold,
    369 U.S. 654 (1962) ................................................................................... 7

Walter v. Mattel, Inc.,
    210 F.3d 1108, 1110 (9th Cir.2000) .......................................................... 10

**PLAINTIFF'S OPPOSITION TO DEFENDANT TACO BELL CORP.'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION**

1

## STATUTES

2   15 U.S.C. §1117 ................................................................................................ 25

3   15 U.S.C. §1117(a) ............................................................................. 18, 23, 24

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S OPPOSITION TO DEFENDANT TACO BELL CORP.'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Taco Bell seeks summary judgment notwithstanding that it adopted the Live MÁS slogan for its Mexican restaurants despite (i) prior knowledge that Poquito Mas, another Mexican restaurant chain whom Taco Bell had already identified as a competitor, had pre-existing and superior rights in a family of MÁS marks (many of which are incontestable), (ii) after having received a warning from its counsel that using MÁS would pose a significant risk, (iii) after having unsuccessfully attempted to deceive Poquito Mas into licensing its MÁS marks, (iv) after being warned by Poquito Mas not to proceed with the infringing MÁS marks, and (v) ignoring this warning and brazenly proceeded "Butch Cassidy Style" to swamp the market with its Live MÁS slogan.

At trial, Poquito Mas will prove liability and cognizable damages caused by Defendant's hijacking of its MÁS marks and its entitlement to enhanced and exemplary damages, costs, and attorneys' fees as a result of Defendants' willful infringement and bad faith tactics.  This is a David and Goliath story with Taco Bell steamrolling its much smaller competitor.  Taco Bell has spent a billion dollars to date swamping the market with the MÁS slogan which Taco Bell's CEO Greg Creed, who was intimately involved with the infringement, has stated is now the "essence of the Taco Bell brand."  As this Court may recall, last summer a jury found against Quiksilver and awarded punitive damages with a considerably less egregious set of facts.   At a minimum, this case should be heard by a jury.

"[S]ummary judgment is generally disfavored in the trademark arena" given the "intensely factual nature" of most trademark claims. Interstellar Starship Services, Ltd. v. Epix Inc., 184 F.3d 1107, 1109 (9th Cir. 1999).  Applying that settled principle here, there are numerous reasons why Defendants' motion should be denied; as discussed below, each involves consideration of competing testimony, documents, and expert

1    analysis appropriate for resolution only at trial.  Poquito Mas therefore respectfully

2    requests that Defendants' motion for summary judgment be denied.

3    **II.    FACTS**

4        **A.    Poquito Mas and its MÁS Marks**

5        In 1984, Kevin McCarney opened the first "Poquito MÁS" restaurant in Studio

6    City California, serving Mexican food (i.e. tacos, burritos, quesadillas, enchiladas,

7    etc.). (Statement of Material Facts ("SMF    ") 1)  Since then, Poquito Mas has

8    expanded the use of the "MÁS" mark to use on its menu items, slogans,

9    advertising/marketing campaigns, food packaging, and social media.  (SMF 3)        The

10   Poquito MÁS mark has been in continuous use since the opening of the first Poquito

11   MÁS restaurant and was registered with the United States Patent and Trademark

12   Office (USPTO) on May 2, 1995.  (SMF 4)  Mr. McCarney has also acquired federal

13   trademark registrations to other composite trademarks bearing the "Poquito MÁS"

14   marks, including two marks with Poquito MÁS and graphics.  The MÁS, Chef MÁS,

15   Mucho MÁS, Mini MÁS, and Get Poquito MÁS out of Life.  The Poquito MÁS, The

16   MÁS, Chef MÁS and Mucho MÁS marks are incontestable.  (SMF 9-10)

17       Poquito Mas has also used "Get Fresh and Get a Little MÁS, Get a Little

18   MÁS…" (e.g. "Get a Little MÁS out of Lunch, Get a Little MÁS out of Dinner, Get a

19   Little MÁS at Night), "Original MÁS," "MÁS Social," "MÁS Local," "Party MÁS

20   (At Home, At Work, At Play)" Little MÁS Catering," "Chef Little MÁS," "Think

21   MÁS" as well as various other usages and phrases containing "MÁS" in connection

22   with the POQUITO MÁS restaurants.  All of the foregoing MÁS Marks, whether

23   registered or unregistered, are owned by Mr. McCarney (the assignor) and assigned,

24   either in writing or orally, to Poquito Mas Licensing Corporation, of which McCarney

25   is the sole shareholder.  (SMF 17)

26       Since 1984, additional POQUITO MÁS restaurants have been opened

27   throughout California as well as one in Hawaii.  (SMF 19)  There are currently eleven

28   POQUITO MÁS restaurants in California, six of which are operated by franchisees of

Poquito Mas, one being on the Warner Bros. Studio Lot.  (SMF 19)  Poquito Mas
marketing channels include television advertisements, radio advertisements, print
advertisements, social media, online advertisements via the POQUITO MÁS Website,
and the restaurants themselves.  (SMF 25)  The MÁS Marks are also featured on cups,
food packaging, menus, signage, clothing, etc.  (SMF 26)  The POQUITO MÁS
restaurants have often been the subject of much unsolicited, laudatory press coverage
in various media, including magazines, online publications, and television shows.
(SMF 34)  POQUITO MÁS is also a favorite amongst celebrities, whom have dined at
or have mentioned dining at POQUITO MÁS.  (SMF 36)   POQUITO MÁS
restaurants make approximately ▓▓▓▓▓ in annual revenues, serving
approximately 1 million customers a year.  (SMF 40)  Poquito Mas sells traditional
Mexican food such as tacos, burritos, tostadas, nachos, salads, quesadillas, etc...
(SMF 1)  POQUITO MÁS menu items range from $1.89 - $9.95.  (SMF 2)

### B.    Defendant Taco Bell

Taco Bell is a Mexican restaurant chain founded in Downey California in 1962.
It has since grown to be a global operation with more than 5,600 restaurants, 800 of
which are located in California.  (SMF 44)  The chain is owned by Yum! Brands, Inc.
(which also owns Pizza Hut and KFC), and is headquartered in Irvine, CA.  (SMF 46)
Like POQUITO MÁS, Taco Bell sells traditional Mexican food, such as burritos,
tacos, salads, nachos, etc.  (SMF 48)  Taco Bell's menu offers price points such that
the consumer can purchase a full meal, including a drink, for around $5.00.  (SMF 50)

Yum Brands annual revenue for 2013 was ▓▓▓▓▓▓.  Taco Bell's annual
revenues were ▓▓▓▓▓ in 2010, ▓▓▓▓▓ in 2011, ▓▓▓▓▓ in 2012, and
▓▓▓ in 2013, and expected revenue for 2014 being ▓▓▓▓.  (SMF 133)  Taco
Bell identified POQUITO MÁS as a competitor as early as September 2004 and once
again identified POQUITO MÁS a Competitor in a December 2011 and to that end
sent individuals to scout various POQUITO MÁS locations.  (SMF 50 - 54)  Taco
Bell's own counsel has identified POQUITO MÁS as a direct competitor.  (SMF 70)

3

### C.    Taco Bell Rebrands

In the summer of 2011, Taco Bell decided to re-brand its company in order to arrest declining sales and the loss of customers.  A key component of this rebranding effort was to replace its existing tagline, "Think Outside The Bun," with something that would attract new customers and make the old customers forget about the bad press surrounding mystery meat tacos and salmonella, as well as the consumer belief that "Taco Bell is cheap and that's why it's low quality."  (SMF 56-57)  A component of this rebranding effort was to shift consumer beliefs by introducing premium ingredients and higher-end products through Taco Bell's "Cantina Bell" menu options to compete with fast-casual restaurants, the fastest growing segment in the restaurant industry, such as POQUITO MÁS or Chipotle.  (SMF 58-59)

Defendant Draft FCB ("FCB") was the advertising agency working with Taco Bell in connection with the rebranding and identification of a new slogan.  (SMF 63)  Greg Creed, Taco Bell's CEO, was adamant that the new slogan be launched in February 2012 during the NBA All-Star weekend.  (SMF 68-69)  As part of this rebranding, in November 2011, Taco Bell sent its agents into the field to identify what its competitors, including POQUITO MÁS, were doing in terms of products, pricing and marketing.  (SMF 53)  Contemporaneous thereto, Taco Bell decided to proceed with a new slogan that contained the Spanish word "MÁS," meaning "more" in English.  Taco Bell and FCB decided they wanted to use a new MÁS slogan <u>prior</u> to having its attorneys conduct a due diligence investigation to ascertain whether the proposed use would conflict with any existing uses.  (SMF 64-67)  On December 1, 2011, Defendants' attorneys at Winston & Strawn conducted a trademark search which identified POQUITO MÁS as having superior rights and flagged Taco Bell's proposed new MÁS marks as presenting a significant risk of a complaint.  (SUF70)

### D.    Taco Bell Attempts to License Rights to MÁS From Poquito Mas

After receiving the "significant risk" opinion, Defendants retained investigator Mike Santoni to deceive McCarney into giving Defendants permission to use a slogan

containing MÁS.  (SMF 73)  Santoni lied to McCarney about his identity, and
represented to Mr. McCarney that he was "Chuck Garvin" from "Clearwater Business
Solutions" who purportedly lived in Florida and represented a small Florida chain of
restaurants that wanted to use MÁS and inferred that they would not be competing
with Poquito Mas, and offered $35,000 for permission to use MÁS, with Defendants
agreeing internally to spend up to $750,000 for these rights.  (SMF 74-75, 88)  When
Santoni refused to tell Mr. McCarney about how the slogan would be used by the
fictitious restaurants in Florida or identify the chain itself, and concerned that the
proposed MÁS slogan may cause confusion in the marketplace, McCarney declined to
grant permission.  (SMF 76)  Taco Bell, fully committed to using MÁS, would not
take no for an answer.

There were several subsequent attempts to convince McCarney to agree to allow
Defendants to use the "MÁS" marks, including an in-person meeting with Jeff Fox
from DraftFCB, McCarney, fearing that Defendants' proposed use of MÁS would
"harm [the POQUITO MÁS] brand, [its] ability to franchise the brand, create
confusion, and diminish the brand distinction [he had] created," declined Taco Bell's
offer.  In a detailed letter set forth his reasoning as well as his objection to Taco Bell
using MÁS.  (SMF 89-99)  Taco Bell then took over the process from FCB and
obtained new pre-cleared opinions which it believed would allow it to proceed with
MÁS as it had already decided to do.  (SMF 100-110)  The later opinions were not
objective, were superficial, did not analyze reverse confusion,  and  actually concede
that several of the Sleekcraft factors favored Poquito Mas.  (SMF 110-112)
Importantly, none said there would be no risk, but rather that Taco Bell should be able
to overwhelm Poquito Mas in the anticipated lawsuit.  (Id.)

### E.     Taco Bell Launches MÁS

Because of the Winston & Strawn opinion letter, FCB refused to allow Taco
Bell to proceed with LIVE A LITTLE MÁS and refused to indemnify Taco Bell in the
likely eventuality of a lawsuit with Poquito Mas .  (SMF 113-114)  "[U]nless Taco

Bell indemnifies Draftfcb on this matter our IPG lawyers and our outside trademark counsel ... will not allow the Live a Little MÁS tagline to be used by Taco Bell." (SMF 114)  In order to circumvent this problem and obtain indemnification and resulting insurance coverage from FCB's carrier, on February 6, 2012 Taco Bell obtained pre-cleared opinions for Live MÁS, which it promptly launched two weeks later during the NBA All-Star weekend.[1]  (SMF 115-118)  As before, these opinions were superficial, not objective, did not analyze reverse confusion, and clearly manufactured to provide an excuse for the intended infringement of Plaintiff's MÁS marks.  (SMF 115)  As Taco Bell's CEO has stated, MÁS is the essence of the Taco Bell brand.  (SMF 138)  The "Live MÁS" tagline has been included in all of Taco Bell's advertisements since the first use of same in February 2012.  (SMF 120)  Taco Bell has spent approximately ███████ annually in advertising since the launch of the "Live MÁS" tagline, a billion dollars to date, mostly in connection with national television advertisements  (SMF 120)  Taco Bell advertises Live MÁS on radio, print, in its restaurants,  on its website, in social media, on packaging, on clothing, etc. (SMF 121-130)

In or around December 2013, Taco Bell asked its market research agency to conduct a study regarding consumer awareness of the "Live MÁS" mark.  The study found that as of  December 2013, 64% percent of Taco Bell users and 58% of quick-service restaurant users were aware the tagline's association with Taco Bell.  (SMF 142)  The study also stated that 94% of quick service restaurant users were aware of Taco Bell's previous Think Outside the Bun tagline as of January 2012 - some ten years after same was introduced.  (Id.)  Taco Bell has indicated that it does not have plans to cease use of Live MÁS, and in fact plans to double in size by 2024  (Id.)

---

[1] When apprised of Taco Bell's decision to proceed with MAS notwithstanding Plaintiff's objection, FCB's attorney stated in an email that "I don't think any of us can wipe the slate clean like that, though I often wish I could."  (SMF 91-93)  Yet this is exactly what Defendants then attempted to do.

**PLAINTIFF'S OPPOSITION TO DEFENDANT TACO BELL CORP.'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION**

1    In 2010 and 2011, McCarney had extensive discussions with Branstetter and

2    Lion Capital regarding the potential acquisition and/or development of the POQUITO

3    MÁS enterprise, including nationwide expansion of the restaurants.  (SMF 146-151)

4    These discussions were put on hold due to the uncertainty of the Taco Bell's use of

5    Live MÁS and the present litigation.  (SMF 152)

6    **III.   LEGAL ARGUMENT**

7    Taco Bell has the burden of showing the absence of a genuine issue as to any

8    material fact.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Courts must

9    view all inferences to be drawn from the evidence lodged in a light most favorable to

10   Poquito Mas .  Anderson v. Liberty Lobby, 477 U.S. 242, 247-248 (1986).  Such

11   inferences may be drawn from subsidiary facts contained in affidavits, attached

12   exhibits, and submitted depositions.  United States v. Diebold, 369 U.S. 654, 655

13   (1962).  Courts must not weigh the evidence or determine the truth of the matters

14   asserted by only determine whether there is a genuine issue for trial.  Southland Sod

15   Farms v. Stover Seed, 108 F. 3d 1134 (9th Cir. 1997).  Any doubt as to the existence of

16   a genuine issue of material fact must be resolved against Taco Bell.  Adickes at 157-

17   159.  To prevail on a claim of trademark infringement a party must establish (1) that it

18   has a protectable ownership interest in the mark; and (2) that the defendant's use of the

19   mark is likely to cause consumer confusion.  Network Automation  v. Advanced

20   Systems Concepts, 638 F.3d 1137, 1144  (9th Cir. 2011).  The Lanham Act's

21   likelihood of confusion standard is predominantly factual in nature.  Thus, summary

22   judgment is inappropriate when a jury could reasonably conclude that there is a

23   likelihood of confusion.  Downing v. Abercrombie & Fitch, 265 F.3d 994, 1001, 1008

24   (9th Cir.2001).  "Indeed, we have observed that "trial courts disfavor deciding

25   trademark cases in summary judgments because the ultimate issue is so inherently

26   factual…   Additionally, the question of likelihood of confusion is routinely submitted

27   for jury determination as a question of fact."  Clicks Billiards v. Sixshooters, 251 F. 3d

28   1252, 1264 (9th Cir. 2001).  This case is no exception.  Each issue discussed below --

1  such as the likelihood of confusion between Poquito Mas' family of MÁS Marks and

2  Taco Bell's MÁS mark -- is "intensely factual."

3       **A.**     **Triable Issues Of Fact Exist Regarding Liability**

4            *1.*     ***Plaintiff has Standing to Assert Claims on All of its MÁS Marks***

5       McCarney, who founded POQUITO MÁS thirty years ago when he opened his

6  first restaurant, is the owner of all of the MÁS marks (registrations and common law

7  rights), the sole owner of Plaintiff, and the sole owner of all of the non-franchised

8  POQUITO MÁS restaurants.  McCarney's rights to the MÁS marks have all been

9  validly assigned to Plaintiff and there is no merit to Defendants' argument that Plaintiff

10 cannot enforce rights as to GET POQUITO MÁS OUT OF LIFE, I AM THE MÁS,

11 and MINI MÁS. [2]  Where Defendants' assignment argument borders on frivolous, its

12 fraud argument regarding the POQUITO MÁS marks steps over the line.

13      Poquito Mas has been using POQUITO MÁS as its trademark and trade name in

14 connection with its Mexican restaurants for thirty years and the POQUITO MÁS

15 marks, which are now incontestable, have been registered for twenty years.  In its

16 brief, Taco Bell calls McCarney a liar: "McCarney knowingly filed affidavits of use in

17 the PTO for the POQUITO MÁS and one of the POQUITO MÁS and Design marks,

18 claiming use in interstate commerce at a time when he knew that was not true." (Mot.

19 pg. 8)  With such an unqualified representation, the evidence contained in SUF#20

20 should be, as required by law, clear and convincing.  However, a simple review of the

21 evidence cited offers no support for the "undisputed fact" of deliberate fraud.[3]  The

22

---

23 [2] Plaintiff's assignment of the Federal trademark registrations is in writing.  An
24 assignment in writing is not necessary to pass McCarney's (a party to this action)
   common law rights in his MAS trademarks, both registered and unregistered, to
25 Plaintiff.  McCarthy at §18:4; C.C. §1052.
   [3] Page 11 of McCarney's deposition confirms that he is the sole owner of Poquito
26 MAS.  The three cited exhibits discuss the Kona restaurant.  None of this evidence
   supports the assertion that McCarney attempted to commit fraud on the PTO.
27 Conspicuously absent from Defendants' SUF is the portion of McCarney's deposition
   wherein he testified that he truthfully stated in his PTO application that he engaged in
28 interstate commerce in 1984 when he first opened his restaurant. (SMF    , ¶ 1, see also

**PLAINTIFF'S OPPOSITION TO DEFENDANT TACO BELL CORP.'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION**

truth of the matter is that Poquito Mas has engaged in interstate commerce since its inception in 1984.[4]

### 2.    No Basis For Summary Judgment on Likelihood of Confusion

Poquito Mas' rights in its MÁS marks include the right to prevent consumer confusion.  Int'l Order of Job's Daughters v. Lindeburg & Co., 633 F.2d 912, 919 (9th Cir. 1980).  Far from seeking an improper "monopoly on the common Spanish word 'MÁS'," as Taco Bell claims, Poquito Mas is simply enforcing its statutory rights against Taco Bell's use of  Live MÁS and MÁS, which is similar enough to its MÁS marks to cause confusion in connection with their respective Mexican restaurants.

Regarding the test for likelihood of confusion, the Ninth Circuit considers eight "Sleekcraft" factors in its analysis:  strength of the mark; proximity of goods; similarity of marks; evidence of actual confusion; marketing channels; degree of care likely to be exercised by the purchaser; defendant's intent in selecting the mark; and likelihood of expansion.  Network Automation,  at 1145(citing AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979)).  However, "the list is not exhaustive," nor is it exclusive, and "[o]ther variables may come into play depending on the particular facts presented."  Id.  "The test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them."  Surfvivor Media  v. Survivor Productions, 406 F.3d 625, 631 (9th Cir.2005).  Likelihood of confusion is not decided "by considering mechanically the number of Sleekcraft factors that weigh in favor of either party, or by giving the same weight to a particular factor from case to case."  Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1141 (9th Cir. 2002).  Rather, Sleekcraft's "multi-factor approach must be applied in a flexible fashion."  Rearden v. Rearden, 683 F.3d 1190, 1209 (9th Cir. 2012).

---

Blakely Dec., Exhibit 97 (McCarney Depo. Transcript, 11:17-19))  Defendants' brief is replete with similar mischaracterizations.

[4] McCarthy, § 19:107-123; Lebewohl v. Heart Attack Grill LLC,  890 FS.2d 278 (SDNY 2012); 15 U.S.C. §1127.

1    Here, Plaintiff has asserted claims of both forward and reverse confusion.  The

2 traditional pattern of classic "forward confusion" occurs when customers mistakenly

3 think that the junior user's goods or services are from the same source as or are

4 connected with the senior user's goods or services.  "Reverse confusion" occurs when

5 the junior user's advertising and promotion swamps the junior user's reparation in the

6 market that customers are likely to be confused into thinking that the senior user's

7 goods are those of the junior user.  J. Thomas McCarthy, *McCarthy on Trademarks*

8 *and Unfair Competition* ("McCarthy"), §23:10, 4th ed. 2014.  Claims of reverse

9 confusion "protect the small senior user from losing control over its identity in 'the

10 rising tide of publicity associated with the junior mark.;" <u>Walter v. Mattel, Inc</u>., 210

11 F.3d 1108, 1110 (9th Cir.2000).  As McCarthy instructs:

12    The archetypical case of reverse confusion occurs when the junior user is
13    a larger company which, prior to its nationwide launch, discovers a small
      (usually regional) senior user with a very similar mark in a related field.
14    Because the smaller senior user has only a relatively small group of
      customers, the large company may (mistakenly) think that there is no
15    conflict because there will be only a local and minimal level of forward
      confusion.  And the junior user has no intention of taking a free ride on
16    the good will and reputation of the small, local    user.   So the junior
      user rolls out its new mark nationally, swamping the local recognition of
17    the senior user.  For example, assume the hypothetical senior user uses
      AUNTIE ISABELLA'S as its mark for a chain of three small pizza
18    restaurants in the vicinity of Seattle, Washington.  Hypothetical national
      marketer Colossal Foods Inc. coincidentally chooses the mark AUNT
19    ISABELLA'S for its new national distributed line of frozen pizza.
      Colossal Foods finds the senior user on a trademark search, but dismissing
20    it as a tiny user with only local recognition, decides to launch nationally.

21    Forward confusion will be likely to occur only when people in Seattle
      who know of the local senior user first come into contact with the junior
22    user's nationally advertised and distributed product, and, because of the
      similarity of the marks, mistakenly think that the junior user is an offshoot
23    or licensee of the senior user.  Reverse confusion will be likely to occur
      when a person who only knows of the well-known junior user (e.g. a
24    visitor from San Francisco) first    comes into contact with the lesser--
      known senior user in Seattle and, because of the similarity of the marks,
25    mistakenly thinks that the senior user is the same as or is affiliated or
      connected with the junior user.  *Simply put, when a large national*
26    *company finds a conflicting mark of a small local user on a trademark*
      *search, it cannot simply go ahead and roll over the smaller senior user.*
27    *To avoid the risk of losing a case of reverse confusion, Colossal foods*
      *must either buy the senior user's mark or change to another mark.*
28    McCarthy at 23:10 (*emphasis added*)

a.      **Strength of Parties' Respective MÁS Marks**

"'The stronger a mark—meaning the more likely it is to be remembered and
associated in the public mind with the mark's owner—the greater the protection it is
accorded by the trademark laws.'" <u>Network Automation</u>, at 1149.  In assessing a
mark's strength, the Court must analyze both its "conceptual" and "commercial"
strength.  <u>Id</u>.  Conceptual strength involves classifying the mark on the spectrum of
distinctiveness, while commercial strength is based on " 'actual marketplace
recognition,' " including advertising expenditures.  <u>Id</u>.   In reverse confusion cases, the
court evaluates the strength of the junior user's mark to gauge its ability to overpower
the senior user's mark.  For reverse confusion, the first three <u>Sleekcraft</u> factors are
"pivotal."  <u>Dreamwerks Prod. Group, Inc. v. SKG Studio</u>, 142 F.3d 1127, 1130 (9th
Cir. 1998) ("So the greater the power of the junior user's mark in the marketplace, the
more likely it is to capture the minds of the senior user's customers).

**i.  Conceptual Strength.**  Several of Plaintiff's federally registered MÁS marks
are incontestable (POQUITO MÁS , MUCHO MÁS, CHEF MÁS, THE MÁS) and
thus presumed to be strong marks.  <u>Entrepreneur Media</u>, at 1135.  Indeed, Federal
trademark registration alone may be sufficient to satisfy a determination of
distinctiveness.  <u>Lahoti v. VeriCheck, Inc</u>., 586 F.3d 1190, 1199 (9th Cir.2009).
Defendants have not challenged the presumption of inherent distinctiveness created by
Poquito Mas' federal registrations.  Furthermore, on the spectrum of marks, Plaintiff's
MÁS marks are inherently distinctive.  There are five categories of trademarks:
generic; descriptive; suggestive; arbitrary; and fanciful.  <u>KP Permanent Make-Up, Inc.
v. Lasting Impression I, Inc.</u>, 408 F.3d 596, 602 (9th Cir.2005).  "The latter three
categories of marks, because their intrinsic nature serves to identify a particular source
of a product, are deemed inherently distinctive."  <u>Two Pesos Inc. v. Taco Cabana, Inc.</u>,
505 U.S. 763, 778 (1992).  These three categories of marks therefore meet the
distinctiveness element automatically.  <u>Kendall-Jackson Winery, Ltd. v. E. & J. Gallo
Winery</u>,  150 F.3d 1042, 1047 (9th Cir. 1998).  Here, because MÁS is an "actual word

1    with no connection to" food and/or restaurants, the MÁS marks are arbitrary and

2    therefore entitled to "maximum trademark protection." <u>Fortune Dynamic, Inc. v.</u>

3    <u>Victoria's Secret</u>, 618 F. 3d 1025, 1032-33 (9th Cir. 2010). [5]

4        Defendants' argument that Plaintiff's MÁS marks exist in a "crowded field" is

5    unavailing.  In order for the purported "crowded field" evidence to have the force that

6    Taco Bell attributes to it, Defendants must also submit evidence of how that third-party

7    advertising or registration was actually used or perceived in the marketplace.  <u>Scarves</u>

8    <u>by Vera v. Todo Imports, Ltd.</u>, 544 F.2d 1167 (2d Cir.1976); 1 T. McCarthy,

9    *Trademarks and Unfair Competition*, (4th ed. 2014) at §11:88.  Here, Taco Bell has

10   simply submitted internet screenshots and USPTO filings, and has offered no evidence

11   to show how and to what extent any of the marks reflected in the registrations and

12   screenshots were in fact used in commerce.  As held in <u>Boldface Licensing + Branding</u>

13   <u>v. By Lee Tillett Inc.</u>, 940 FS 2d 1178 (CD Cal. 2013),  the mere citation of third party

14   registrations and screenshots are not proof of third party uses for the purpose of

15   showing a crowded field and relative weakness because they are not evidence  of use

16   so as to have conditioned the mind of prospective purchasers.  <u>Id.</u> at 1191; *see also*

17   <u>Palantir Technologies Inc. v. Palantir.net, Inc.</u>  2008 WL 152339 (ND Cal. 2008).

18       **ii.  Commercial Strength.**  Poquito Mas has been operating restaurants and

19   selling food under its MÁS marks for 30 years, has annual sales of ███████, has

20   advertised and received unsolicited media attention during that time. Indeed, Taco Bell

21   admits in its brief that Poquito Mas' marks are commercially strong.  (MSJ pg. 12)

22   Taco Bell incorrectly argues that because Plaintiff's MÁS marks are commercially

23   strong there can be no reverse confusion.  In cases of reverse confusion, the strength of

24   the junior user's mark is analyzed in order to determine its ability to overpower that of

25

26   [5] Contrary to Taco Bell's assertion, the MAS marks are not suggestive merely because
     the English translation means more or that MAS is a Spanish word and Mexicans tend

27   to speak Spanish.  A suggestive mark is one that "does not describe the products
     features, but suggests them." <u>Entrepreneur Media</u>, at 1142. Poquito MÁS, The MÁS,

28   Mucho MAS, etc., suggest nothing about the features of Poquito MAS' s product.

1   the senior user. <u>Dreamwerks</u>, at 1130; <u>Fisons Horticulture, Inc. v. Vigoro</u>, 30 F.3d 466,

2   479 (3rd Cir. 1994).  Consequently, even if a regional senior user's mark is strong

3   where it is located, the proper analysis is whether the junior user has the ability to

4   swamp or otherwise overpower the senior user.  Here, there really is no comparison.

5         Taco Bell's use of MÁS as its slogan follows the traditional market saturation

6   model.  Yum Brands, which owns Taco Bell, made ██████ in revenues in 2013.

7   (SMF 46, 132)  In 2013, Taco Bell's 5,700 restaurants, 800 of which are located in

8   California, generated revenues of ██████, with revenues in 2014 expected to be ██

9   ██. (SMF 45, 133)  Since its launch on February 26, 2012, Taco Bell has spent

10  approximately ██████ a year advertising the Live MÁS slogan, which appears on

11  virtually all of Taco Bell's advertising.  (SMF 120)   Taco Bell has begun saturating

12  the market with its Live MÁS slogan via television advertising, marketing, in-store

13  use,  on food wrappers, on products, etc.  (SMF 119-130)  Similar to Taco Bell's Think

14  Outside of the Bun slogan which LIVE MÁS replaced, while Taco Bell's customer

15  recognition is currently around ██ Taco Bell expects full saturation in about 7 years

16  of use with expected customer recognition reaching ██ As IPG's counsel Gabi

17  Davis aptly stated, this is truly a case of David vs. Goliath.  (SMF 72)

18         **b.    <u>Parties Respective Goods/Services are Identical</u>**

19         "If the defendant and plaintiff use their trademarks on the same, related, or

20  complementary kinds of goods there may be a greater likelihood of confusion about

21  the source of the goods than otherwise."  Ninth Cir. Model Jury Inst. 15.16.  Examples

22  of "proximate" goods are those which complement one another, are sold to the same

23  class of consumers, or are similar in use and function. <u>Network Automation</u>, at 1150.

24  Where the goods are similar in use and function, less similarity between the marks may

25  be required to make a finding of likelihood of confusion. <u>Sleekcraft</u>, 599 F.2d at 350.

26  Both parties sell traditional Mexican food.  (SMF 1,48)  As Taco Bell's own counsel

27  has admitted, "[t]he goods and services offered by [Poquito Mas] and [Taco Bell] in

28

**PLAINTIFF'S OPPOSITION TO DEFENDANT TACO BELL CORP.'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION**

1  connection with their respective MÁS - inclusive marks are effectively identical.  This

2  factor would weigh against [Taco Bell]." (SMF 1,48,110)

3                         **c.**       **The Parties' Marks are Highly Similar**

4          "If the overall impression created by the plaintiff's trademark in the marketplace

5  is similar to that created by the defendant's trademark in appearance, sound or

6  meaning, there is a greater chance of likelihood of confusion. Similarities in

7  appearance, sound or meaning weigh more heavily than differences in finding the

8  marks are similar."  Ninth Cir. Model Jury Inst. 15.16; GoTo.com, Inc. v. Walt Disney

9  Co., 202 F.3d 1199, 1205 (9th Cir., 2000).

10          **i. Plaintiff Has a Family of MÁS Marks**.  "A trademark owner may use a

11  number of marks with a common feature or 'surname' that is distinctive enough to be

12  recognized by the consuming public causing them to associate such derivative marks

13  with the trademark owner." CaesarsWorld, Inc. v. Milanian, 247 FS 2d 1171, 1197

14  (D.Nev., 2003).   "Whether a family of marks exists is an issue of fact based on the

15  common formative component's distinctiveness, the family's use, advertising,

16  promotion, and inclusion in party's other marks." AM General v. DaimlerChrysler,

17  311 F.3d 796, 815 (7th Cir.2002).   Over the past 30 years, Poquito Mas has used over

18  twenty MÁS Marks in connection with its restaurants.  Many of these marks are

19  registered and five have achieved incontestable status.  (SMF 3-10) The MÁS marks

20  are used extensively, and in conjunction with one-another in Plaintiff's advertising and

21  promotion.  (SMF 3-38)  Printed publications show that the public regards the marks as

22  being part of the MÁS family.  (SMF 49)  *See e.g.*, 7–Eleven, Inc. v. Wechsler, 2007

23  WL 1431084 (T.T.A.B.2007) (family of Gulp marks).  Defendants' own counsel has

24  admitted that "[McCarney/Poquito Mas] has a family of marks centered around the

25  MÁS component."  (SMF 72)  Finally, whether or not a family of marks exists, Taco

26  Bell's use of MÁS is highly similar to the numerous MÁS marks used by Plaintiff.

27          **ii.  Taco Bell and Plaintiff's use of MÁS is similar.**   In the present case, both

28  Poquito Mas and Taco Bell share use of the word "MÁS"  as a dominant element in

their marks.  E&J Gallo v. Gallo Cattle, 967 F. 2d 1280, 1291 (9th Cir. 1992); Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 218 USPQ 390 (Fed. Cir. 1983).  Moreover, even without a family of Marks (which exists here), the use of one mark may constitute a  legal equivalent of another mark if it is an immaterial variation and creates the same continuing commercial impression.  HGI Marketing Services, Inc. v. Pepsico Inc., 1995 WL 89385 (9th Cir. 1995).  This is particularly applicable in this case. The meaning of the MÁS marks as used by both parties is the same, they literally mean nothing in the context used.  Plaintiff's The MÁS, Mucho MÁS, Poquito MÁS etc. are meaningless as they relate to Mexican restaurants.  The same holds true for Live MÁS.  And to the extent the uses suggest more of something, they both do equally.  Dreamwerks, 142 F.3d at 1131.   The word MÁS is the essence of Taco Bell's brand, which uses it alone and in conjunction with Live MÁS.  Both parties depict MÁS with the accent, and the sound of the word MÁS and the parties' permeations thereof are virtually identical.

     **iii.  Taco Bell's Use of  a House Mark.**   Taco Bell uses Live MÁS both alone and in conjunction with its house mark.  Such coupling with the house mark aggravates the possibility of reverse confusion by reinforcing the association with the word  MÁS exclusively with Taco Bell.  A&H Sportswear,. v. Victoria Secret 237 F. 3d 198, 230 (3rd Cir. 2000); Americana Trading Inc. v. Russ Berrie & Co., 966 F.2d 1284, 1288 (9th Cir.1992).

     **d.    Evidence of Actual Confusion**

     As this Court recently pointed out in QS Wholesale  v. WMI, "survey evidence is not required to establish likelihood of confusion" or necessary to prove trademark infringement. (Case No. 12-0451, Dkt. #359 pg. 18;  Cairns v. Franklin Mint Co., 24 F.Supp. 2d 1013, 1041 (C.D. Cal. 1998).  Indeed, it is well established that actual confusion is not necessary to a finding of likelihood of confusion.  Network

1   <u>Automation</u>, 638 F.3d at 1151.[6]  Defendants' rely exclusively -- and inappropriately --

2   on a survey conducted by Dr. Simonson designed to address the issue of likelihood of

3   reverse confusion.   As discussed in Plaintiff's evidentiary objections, Dr. Simonson's

4   survey is not only irrelevant to forward confusion, it is fundamentally flawed, entitled

5   to no weight,  and should be disregarded.  Defendants' argument that they are entitled

6   to a presumption that the results of a survey by Poquito Mas would have been

7   unfavorable" is incorrect.  As held by this Court in <u>QS Wholesale</u>, such an inference is

8   appropriate only if the plaintiff "has the financial resources" to conduct a survey. (Case

9   No. 12-00451, Dkt.#359 pg. 18; <u>Charles Jacquin Et Cie, Inc. v. Destileria Serralles,</u>

10   <u>Inc</u>., 921 F.2d 467, 475 (3d Cir. 1990); <u>Cairns v. Franklin Mint Co</u>., *supra*.   Poquito

11   Mas lacks such resources. (SMF 56)

12                    e.      **Parties Use Identical Marketing Channels**

13            "If the plaintiff's and defendant's goods are likely to be sold in the same or

14   similar stores or outlets, or advertised in similar media, this may increase the

15   likelihood of confusion."   [Ninth Cir. Model Jury Inst. 15.16; <u>Network Automation</u>,

16   638 F.3d at 1150-51]  "Similarity of trade channels does not require sales of both

17   parties' goods by identical vendors, but only by the same type of distribution

18   channels."  <u>E&J Gallo Winery v. Pasatiempos Gallo</u>, 905 F.Supp. 1403, 1413 (ED Cal.

19   1994).  Plaintiff and Defendant both advertise and/or otherwise promote their

20   respective products through normal marketing channels associated with Mexican

21   restaurants (through their respective restaurants, television, radio, social media,

22

23

24

---

25   [6] "Its absence is generally unnoteworthy" and "given little probative weight." <u>Cohn v.</u>
26   <u>Petsmart, Inc</u>., 281 F.3d 837, 842 (9th Cir. 2002).  "The failure to prove instances of
     actual confusion is not dispositive against a trademark plaintiff, because actual
27   confusion is hard to prove;  difficulties in gathering evidence of actual confusion make
     its absence generally unnoteworthy." <u>Brookfield Commc'ns., Inc. v. W. Coast Entm't</u>
28   <u>Corp</u>., 174 F. 3d 1036, 1050 (9th Cir. 1999).

**PLAINTIFF'S OPPOSITION TO DEFENDANT TACO BELL CORP.'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION**

1 websites[7], food packaging, clothing, etc.)   (SMF      )  Again, Taco Bell's own

2 counsel has admitted that the marketing channels are the same.  (SMF 111)

### f.    There is a Low Degree of Consumer Care

4    Low consumer care increases the likelihood of confusion.  <u>Network Automation</u>,

5 638 F.3d at 1152.  "Consumers of fast-food are unlikely to employ much care during

6 their purchases."  <u>Audi AG v. D'Amato</u>, 469 F.3d 534 (6th Cir. 2006).  Here, the

7 parties respective fast foods are sold at extremely low price points.  (SMF 2, 50)

### g.    Taco Bell Acted With Knowledge of Plaintiff's MÁS Marks

10    Whether or not Taco Bell acted in good faith is not the test for intent under

11 <u>Sleekcraft</u>.[8]  Rather, the test is <u>knowledge</u>:  the intent factor "favors the plaintiff where

12 the alleged infringer adopted his mark with knowledge, actual or constructive, that it

13 was another's trademark."  <u>Brookfield</u>, 174 F. 3d at 1059; McCarthy at 23:10 (intent to

14 "free ride" irrelevant). Taco Bell had already identified Poquito Mas as a competitor as

15 early as 2004.  When Taco Bell analyzed its competitors as part of its re-branding

16 process in 2011, it visited Poquito Mas and  then had its counsel run a search on MÁS

17 marks, which identified Plaintiff's MÁS marks and  flagged Taco Bell's proposed

18 marks as a significant risk.  Defendants, aware that the proposed MÁS slogans were

19 confusingly similar to Plaintiff's MÁS marks, then attempted to procure use of

20 Plaintiff's MÁS marks by deception.  When Plaintiff refused to license his mark and

21 objected to any use of Live a Little MÁS, Live MÁS, or a similar use of a mark

22 containing MÁS, Taco Bell went ahead "Butch Cassidy Style" with a MÁS mark

---

[7]  Use of "the Web, as a marketing channel, is particularly susceptible to a likelihood of confusion since…it allows for competing marks to be encountered at the same time, on the same screen." <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1207 (9th Cir. 2000).

[8]  Absence of malice is no defense to trademark infringement:  "In "Through the Looking Glass" we are told the walrus shed copious tears as he devoured the innocent oysters who had accepted his invitation to stroll along the beach. He meant them no harm, of course. He merely wished to eat them." <u>Dreamwerks</u>, 142 F.3d at 1132, fn12.

17

anyway.   There is no question that Defendants' acted with knowledge of Plaintiff's MÁS marks when the Live MÁS slogan was adopted.  In fact, because Taco Bell had previously been held liable and required to pay $42 million in damages in connection with its misappropriation of the Chihuahua character and Yo Quiero Taco Bell! slogan that immediately preceded Think Outside The Bun,  (SMF 55; <u>Taco Bell Corp. v. TBWA Chiat/Day Inc</u>., 552 F.3d 1137 (9th Cir. 2009), it is subject to a higher level of scrutiny in this case.  (SMF 55)  <u>Playboy Enterprises, Inc. v. Chen</u>, 1996 U.S. Dist. LEXIS 21916, *34 (C.D. Cal. Oct. 1, 1997);  <u>Guru Denim v. L.A. Idol Fashion, Inc</u>., 2012 U.S. Dist. LEXIS 10363, *3 (C.D. Cal., Jan. 25, 2012).

> **h.      Defendants' Use of MÁS Hinders Plaintiff's Expansion**

Defendants' own attorneys have observed that, the last <u>Sleekcraft</u> factor, likelihood of expansion, has limited relevance here given that the parties were already competing, (SMF 111) <u>Brookfield</u>, at 1060.   On the final <u>Sleekcraft</u> factor, a court "must determine whether existence of the allegedly infringing mark is hindering the plaintiff's expansion plans." <u>Entrepreneur Media</u> at 1141.  McCarney's plan to create a successful business that could be readily franchised across the nation has been put on hold due to the uncertainty of Taco Bell's Live MÁS.  (SMF 144-153)

> **B.      Triable Issues Of Fact Exist Regarding Damages**

Under the Lanham Act, a party that demonstrates infringement is "entitled, ... subject to the principles of equity, to recover ... any damages" it has "sustained."  15 U.S.C. §1117(a).  The Ninth Circuit has emphasized that the statute "confers a wide scope of discretion" on district courts in fashioning a remedy.  <u>Maier Brewing Co. v. Fleischman Distilling Corp</u>., 390 F. 2d 117, 121 (9th Cir. 1968).   The equitable nature of the damages inquiry leaves little room for hard-and-fast rules; instead, relief for infringement is based on "the totality of the circumstances." <u>Lindy Pen Co. v. Bic Pen Corp</u>., 982 F. 2d 1400, 1411 (9th Cir. 1993).

Damages are therefore appropriate if a party has shown "some injury resulting from the [infringer's] deception." <u>Harper House, Inc. v. Thomas Nelson, Inc</u>., 889 F.

2d 197, 210 (9th Cir. 1989); Healthport Corp. v. Tanita Corp. of Am., 563 FS 2d 1169, 1182 (D. Or. 2008) (monetary relief also appropriate where the defendant has derived an "actual benefit" from its infringing conduct).  Cognizable injuries include lost revenues, including reasonable royalties,  the infringer's profits from infringement, and loss of goodwill or ability to control one's reputation.  Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 10 (1st Cir. 2004); Sands, Taylor & Wood v. Quaker Oats Co., 34 F.3d 1340 (7th Cir. 1994) (Sands II); Quia Corp. v. Mattel, Inc., Inc., No. C 10-1902, 2011 WL 2749576, *5 (N.D. Cal. July 14, 2011).  Once an injury is adequately proven, equity also demands that the court "carefully fashion [a] remed[y] which take[s] all the economic incentive out of trademark infringement." Playboy Enters., Inc., v. Baccarat Clothing Co., 692 F.2d 1272, 1275 (9th Cir. 1982) ("[T]he public is injured by an inadequate judicial response to trademark infringement."). "[A] trademark plaintiff is entitled to effective relief; and any doubt in respect of the extent thereof must be resolved in its favor as the innocent producer and against the [defendant], which has shown by its conduct that it is not to be trusted." Polo Fashions  v. Dick Bruhn, 793 F.2d 1132, 1135 (9th Cir. 1986).

Contrary to Taco Bell's claim, Plaintiff's damages claims rest on more than idle "speculation." As discussed in the statement of facts above, Taco Bell tried, but failed, to license the MÁS marks initially for $50,000 and were willing to pay up to $750,000. Taco Bell knowingly adopted  MÁS not only in its new slogan, but as the essence of Taco Bell.  Taco Bell reaped advantages from its infringement, flooding the market with its new Live MÁS slogan.   Poquito Mas suffered losses of royalty payments and goodwill, most particularly the loss of control over its marks (not to mention incurred substantial litigation costs) as a result.  On that record, a jury could easily find that Poquito Mas' damages claims have been proven with "reasonable certainty"; indeed, Poquito Mas submits that the record is sufficiently clear that Taco Bell will also be held accountable for enhanced damages under Section 1117(a) of the Lanham Act and exemplary damages under California law.

### 1.    *Plaintiff Is Entitled to Damages in the Form of Reasonable Royalties*

Taco Bell's argument regarding Plaintiff's reasonable royalties claim misstates both the law and the facts, and ignores this Court's ruling in QS Wholesale, Inc. v. World Marketing, Inc.2013 WL 1953719 (C.D.Cal.,2013).  As this Court held:

> Reasonable royalties, which are a calculation of the hypothetical licensing royalties that an infringer would have paid to the senior owner of a mark, can be recovered as a measure of damages in trademark infringement cases." QS Wholesale at *4.(cites omitted)  Contrary to Taco Bell's assertion that royalties  are speculative unless there is a prior license agreement, "[t]he Ninth Circuit has made no such categorical statement, however, finding only more generally that '[i]n the absence of a legitimate proposed basis on which to calculate a royalty,  awarding a reasonable royalty…would be impermissibly speculative.'" Id. (cites omitted) "Even in cases without [prior licensing] agreements ... courts have awarded or approved of 'reasonable royalty' damages if the evidence provides a sufficiently reliable basis from which to calculate them.'" Id.  (cites omitted)  In Adidas, for example, a case within the Ninth Circuit, even when no previous licensing agreement existed between the plaintiff and the defendant, and the plaintiff "concede[d] that it would not have licensed the marks to [defendant] Payless," the court upheld a jury's reasonable royalties award that was "consistent with royalties between adidas or Payless with third parties and  also with royalties between third parties." (cites omitted)

In QS Wholesale this Court held that Quiksilver's attempts to *purchase* the Visitor mark from World Marketing, by itself, was a sufficient basis to calculate a reasonable royalty.  Id. at *5.[9]  At the outset, Plaintiff has never stated that he was unwilling to license the MÁS marks.  To the contrary, McCarney has not only considered licensing said marks, he has done so in connection with his franchisees. (SMF 18, 20)  Plaintiff remains open to licensing "out" its MÁS marks. (SMF 18) There is also an extensive record of negotiations between Taco Bell and Poquito Mas regarding licensing the MÁS marks.  (SMF 73-99)  Defendants reached out to McCarney on numerous occasions in a concerted effort to obtain rights to the marks,

---

[9] In explaining its conclusion, this Court stated that "[a]s a policy matter, the Court finds this result in congruence with the trademark law's function: it takes the economic incentive out of infringement and promotes a fair and competitive marketplace.  Id.

1  offering McCarney $50,000 initially and considered going as high as $750,000.

2  Finally, there is an extensive record of the negotiations between Poquito Mas ,

3  Branstetter and Lion in 2010/2011.  (SMF 146-152)

4      Taco Bell does not address Dr. Scott Phillips expert testimony that a reasonable

5  royalty can be based upon:  1)  Poquito Mas licenses its trademarks or franchises its

6  restaurant system, including trademarks, to third parties in the United States[10], 2) Taco

7  Bell licenses its trademarks to franchisees and licensees in the United States, 3)

8  trademark licensing is common in the restaurant industry, 4)  over a period of two

9  months Poquito Mas and Defendants engaged in discussions to use Plaintiff's MÁS

10  marks, [11] and 5) Plaintiff has licensed its marks in the past and has engaged in

11  extensive discussions with various venture capitalist groups about expanding

12  nationwide and  licensing its marks in connection therewith.  (SMF 18,20,146-152)

13  Indeed, Taco Bells own expert, Louis Berneman, assumed that a reasonable royalty

14  was an appropriate measure of damages and concluded that royalty damages would be

15  in the ███████████████████.  (SMF 162)

16          **2.    *Plaintiff Is Entitled to Damages for Corrective Advertising and***

17               ***Loss of Ability to Control Its Goodwill and Reputation***

18      "An award of the cost of corrective advertising, like compensatory damage

19  awards in general, is intended to make the plaintiff whole.  It does so by allowing the

20  plaintiff to recover the cost of advertising undertaken to restore the value plaintiff's

21  trademark has lost due to defendant's infringement." <u>Adray v. Adry-Mart, Inc.</u>, 76

22  F.3d 984, 988 (9th Cir., 1995).  A plaintiff need not show a specific measure of harm to

23  its goodwill and reputation in order to recover corrective damages.  <u>Id</u>.  Actual

24

25  ─────────────────────
   [10] The fact is that PM licenses its trademarks to others: That it does so within the
26  context of a franchise agreement is a distinction without a material difference.

27  [11] The fact that PM took the time to consider the offers of TB demonstrates that PM
   did not categorically reject, the possibility that it would enter into a trademark license
   under circumstances that it concluded were satisfactory to it.
28

damages under the Lanham Act are calculated based on tort-law principles. <u>Lindy Pen</u>, 982 F. 2d at 1408 .   A well-known principle of tort law is that loss of goodwill or reputation is difficult to quantify.  <u>Days Inns Worldwide, Inc. v. Patel</u>, 2005 WL 4655381, *5 (SD Cal. 2005)  *see* Restatement (Second) of Torts § 912 ("For harm to ... reputation, compensatory damages reasonably proportioned to the intensity and duration of the harm can be awarded without proof of amount other than evidence of the nature of the harm").   Accordingly, once a jury determines the presence of an injury, the jury then has the discretion to make a reasonable estimate of the harm caused to Plaintiff's reputation by Defendants.  <u>Skydive Ariz.  v. Quattrochi</u>, 704 FS 2d 841 (D.Ariz.,2010).  Corrective advertising is particularly appropriate in cases of reverse confusion where the junior user has saturated the market with its infringing mark.  <u>Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co</u>., 561 F.2d 1365 (10th Cir. 1977)

Poquito Mas, over the past thirty years, has spent significant time, effort, and resources to achieve,  as many have acknowledged, a stellar reputation .  With knowledge and reckless disregard of Plaintiff's rights,  Taco Bell saturated the United States with its infringing MÁS mark to the extent that as of  2013 64% of Taco Bell's customers associated the MÁS marks with Taco Bell and not Plaintiff.  While corrective advertising may not be as important in connection with consumers already aware of Plaintiff's restaurants, it is critical for consumers who do not know of Plaintiff and perceive MÁS to associated with Taco Bell - critically in San Diego, Northern California, and other areas where Plaintiff will naturally expand.  As Plaintiff's expert, Bruce Silverman opined:

> Taco Bell will have spent close to ██████ promoting its restaurants via its "LIVE MÁS" advertising campaign by the end of 2014.  It will require a herculean effort for a small company like Poquito Mas to reclaim its singular identification with the "MÁS" marks.  In my experience, once a trademark's meaning and origination is clouded, it is very difficult to restore it to its full value.  (SMF 163-164)

1    The very real damage caused by the loss of control of its MÁS marks and

2  resulting goodwill had a very real and tangible negative impact on Poquito Mas when

3  negotiations with Branstetter and Lion ceased due to the uncertainty of Taco Bell's use

4  of MÁS.  (SMF 152-153)  Corrective advertising is a particularly appropriate remedy

5  in cases of reverse confusion.  (SMF 163-164)  For the same reasons, Plaintiff is

6  entitled to damages for the loss of the ability to control its reputation.  "A finding of

7  infringement implicitly signifies a loss of expectation and goodwill as well." Citizens

8  Financial Group, Inc. v. Citizens Nat. Bank of Evans City, 383 F.3d 110, 131 (3d Cir.

9  2004). Professor McCarthy explains the presumption in these terms:

10       Injury is presumed because if confusion is likely, it is also probable that
         the senior user's reputation is placed in the hands of another - the junior
11       user. The law views the owner of a trademark as damaged by an
         infringing use "which place[s] the owner's reputation beyond its control,
12       though no loss in business is shown." This probable loss of control over
         reputation and goodwill is presumed by the law to be an injury.  5
13       McCarthy at 30:2.

14            ***3.    Plaintiff Is Entitled to a Disgorgement of Defendants' Profits***

15    "[D]isgorgement of profits is a traditional trademark remedy." Jerry's Famous

16  Deli, Inc. v. Papanicolaou, 383 F.3d 998, 1004–05 (9th Cir., 2004).  "In assessing

17  profits the plaintiff shall be required to prove defendant's sales only; defendant must

18  prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).  The Ninth

19  Circuit has previously required a showing of willful infringement as a prerequisite to

20  recovery of an infringer's profits when the parties are not in direct competition. Lindy

21  Pen, 982 F. 2d at 1406.  However, a 1999 amendment to Section 1117 "replaced 'or a

22  violation under section 43(a)' with 'a violation under section 43(a), or a willful

23  violation under section 43(c).'"  Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 174

24  (3d Cir.2005)  In Banjo Buddies, Inc., the Third Circuit found that the 1999

25  amendment to Section 1117 "effectively superseded the willfulness requirement as

26  applied to § 43(a)." Id.; See e.g., Quick Technologies, Inc. v. Safe Group PLC, 313

27  F.3d 338 (5th Cir.2003); Synergistic v. Korman, 470 F. 3d 162 (4th Cir. 2006); Nike v.

28  Top Brand, 2005 WL 1654859 (SDNY 2005).  Courts in the Ninth Circuit have

1    followed suit.  *See e.g*., Pom Wonderful v. Purely Juice, 2008 WL 4222045 (CD Cal.

2    2008); R&R Partners v. Tover, 2007 WL 1202802 (Nev. 2007).  Consequently, if

3    liability is established,  plaintiff "*shall* be entitled ... to recover defendant's profits."

4    15 U.S.C. §1117(a).   Additionally, even under the former Lindy Pen standard Plaintiff

5    would be entitled to disgorgement due to the fact that Taco Bell did in fact act

6    willfully[12] and, as it has admitted, Taco Bell is a direct competitor of Poquito Mas .

7                    **4.    *Plaintiff Is Entitled to Injunctive Relief***

8            A permanent injunction is the usual and normal remedy once trademark

9    infringement has been found in a final judgment.  McCarthy at §30:1.  "In a trademark

10   infringement claim, 'irreparable injury may be presumed from a showing of likelihood

11   of success on the merits,'" Marlyn Nutraceuticals v. Mucos Pharma , 571 F.3d 873,

12   877 (9th Cir. 2009); McCarthy at §30:1.  There is no question that Taco Bell continues

13   to use the Live MÁS slogan and has no intention of stopping unless ordered to do so.

14   As McCarthy warns, "if a court were to permit the infringer to continue its infringing

15   activities, the result would be a judicially imposed compulsory license given to an

16   infringer."  McCarthy at §30:1. Upon a finding liability, absent an injunction

17   consumers will continue to be confused.   As to inadequate legal remedies, the ongoing

18   infringing use by Taco Bell of Live MÁS in the marketplace  creates an uncertainty

19

20   _____

21   [12] Even if willfulness were a factor in disgorgement, numerous questions of fact exist.
     Among other things, there is the first opinion from Winston & Strawn stating that there
     was a significant risk to using MÁS.   There is evidence that Defendants were

22   proceeding with MAS no matter what.   The later advice of counsel opinions were
     incompetent (did not consider reverse confusion, etc.), not objective and were

23   manufactured to overcome Plaintiff's objection and obtain indemnification/insurance
     coverage.   The conclusory and superficial nature of the later opinions.  Defendants did

24   not actually rely on the opinions. *See e.g*., Adidas v. Payless, 546 FS 2d 1029, 1049
     (DC OR. 2008); Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1302

25   (9th Cir.1999).  There is also evidence that, particularly after Taco Bell Corp. v.
     TBWA Chiat/Day Inc. 552 F.3d 1137 (9th Cir. 2009), indemnification from FCB and

26   resulting insurance coverage, and not any advice of counsel opinion, was the reason
     Taco Bell went forward with Live MAS.   Where, as here, the analysis turns ultimately

27   on questions as to state of mind, summary judgment is generally inappropriate); Chiron
     Corp. v. Genentech, Inc., 268 FS2d 1117 (ED Cal.,2002).

28

1   and a potential for confusion in Plaintiff's business that is not easily quantifiable.

2   MGM v. Grokster, Ltd., 518 FS 2d  1197, 1220 (CD Cal. 2007); McCarthy §30:1.  The

3   balance of hardships weighs heavily in favor of an injunction. Granting an injunction

4   would not impose a hardship on Taco Bell , which has the resources to change to

5   another slogan.  On the other hand, denying an injunction "would create a situation in

6   which Plaintiff could only enforce its intellectual property rights by seeking [further]

7   statutory damages," and "this would constitute a substantial hardship" to Plaintiff.

8   Louis Vuitton v. Akanoc Solutions, Inc., 2010 WL 5598337, at *18 (ND Cal. 2010).

9   Finally, an injunction protecting Plaintiff's intellectual property rights would serve the

10  public's interest. Id. at *19.  Any doubt as to a permanent injunction is to be resolved

11  against the infringer.  Warner & Co. v. Eli Lilly & Co, 265 U.S. 526, 532 (1924).

12              *5.*     ***Plaintiff Is Entitled to Punitive Damages and Attorney's Fees***

13          Under California law, punitive damages are permitted when a plaintiff proves

14  that the defendant acted with oppression, fraud or malice.  CC§ 3294(a).  Under the

15  Lanham Act, attorneys fees may be awarded if the defendant's conduct was willful.  15

16  U.S.C. §1117.  Taco Bell has not moved for Summary Judgment on either element of

17  damages.  In QS Wholesale this Court upheld an award of punitive damages and

18  attorney's fees on facts similar to the present case, i.e., knowledge of mark, attempt to

19  license rights, small company bullied by a larger company, refusal to stop infringing

20  (12-cv-00451, Dkt. #359)

21  **IV.   CONCLUSION**

22          "This dispute could have been avoided had [Taco Bell] been more careful, or a

23  tad more creative, in choosing its [slogan]." Dreamwerks at 1132.  Plaintiff

24  respectfully requests that this Court DENY Defendant's Motion in its entirety.

25   DATED:  December 22, 2014          BLAKELY LAW GROUP

26                                      By:   */s/ Brent H. Blakely*

27                                            Brent H. Blakely
                                              Cindy Chan
28                                            ***Attorneys for Plaintiff***
                                              ***Poquito Mas Licensing Corporation***